| | |
|---|---|
| WILLIAM BODEMER and )<br>INNOVATIVE BEVERAGE, INC.,  )<br> )<br> Plaintiffs/ Counter-Defendants,  )<br> )<br>v.  )<br> )<br>SWANEL BEVERAGE, INC.,  )<br> )<br> Defendant/ Counter-Claimant.  ) | No. 2:09 CV 90 |

## OPINION AND ORDER

Plaintiffs and counter-defendants William Bodemer and Innovative Beverage Inc. have moved for summary judgment on their complaint for a declaratory judgment and on defendant and counter-claimant Swanel Beverage, Inc's (hereinafter "Swanel") counterclaims. (DE # 34.) For the reasons set forth below, that motion is granted in part and denied in part.

## I. BACKGROUND[1]

Swanel is a privately held beverage corporation headquartered in Hammond, IN, that does business across the United States. Swanel's business consists of selling approximately fifty soft drink, juice drink, and energy drink products. Additionally, Swanel rents beverage dispensing equipment to restaurants, bars, and other establishments. Swanel's primary energy drink is a product called "Banzai Energy

---

[1] The facts that follow are construed most favorably to Swanel, the non-moving party. *Chmiel v. JC Penney Life Ins. Co.*, 158 F.3d 966, 968 (7th Cir. 1998).

Blast." Swanel sells Banzai in both a can and in the bag-in-box format.[2] Banzai is intended to be a cheaper alternative to Red Bull.

Prior to 1994, Bodemer worked for a beverage company called T&C Carbonics ("T&C"), holding positions that included sales representative and manager. A competitor of Swanel, T&C sold fountain beverages and juices. In 1994, Swanel purchased T&C, and Bodemer began working at Swanel as an outside sales manager. Bodemer was eventually promoted to Swanel's National Sales and Marketing Manager. Bodemer's duties in that role involved maintaining relationships with current and prospective Swanel clients, developing new products, and maintaining quality control. Bodemer was involved with almost every facet of Swanel's business.

After Bodemer had worked for Swanel for approximately three years, Swanel and Bodemer entered into an agreement that contained both non-compete and confidentiality provisions. Bodemer continued his employment with Swanel until February 2009. On February 13, 2009, Bodemer informed Swanel that he was leaving his position. Four days later, on February 17, Swanel management informed Bodemer that he did not need to finish out his remaining two weeks, and instructed him to stop working immediately. Swanel also had one of its attorneys send Bodemer a letter on that same day, which reminded Bodemer of the non-compete and confidentiality agreements he had signed, and stated in relevant part:

---

[2] The bag-in-box format consists of a three-gallon bag of concentrated product that retailers mix with water or seltzer water to create the finished product.

[A]ll information and materials you have received, encountered, and/or learned during your employment with Swanel **must be treated and kept as confidential**.

(DE # 1-2 at 5 (emphasis in original).)

In November 2008, Bodemer incorporated Innovative Beverage, Inc. (hereinafter "Innovative"). At some point in the months following Bodemer's departure from Swanel, Bodemer began operating Innovative. Bodemer initially ran Innovative out of his own home, but has since moved the business to a warehouse. Innovative produces an energy drink called BAM, a product similar to Swanel's Banzai energy drink.

Innovative has since started competing with Swanel. Innovative has successfully convinced at least one of Swanel's retail clients to switch its business to Innovative. That business, Kam's, located in Champaign, Illinois, was originally a client of T&C Carbonics, but became one of Swanel's clients after Swanel bought T&C Carbonics in 1994.

In April 2009, Bodemer and Innovative (hereinafter "Bodemer") commenced the current action seeking a declaration that Bodemer did not violate the non-compete agreement, that the confidentiality agreement is unenforceable, and that Swanel does not have any information eligible for protection under the Indiana Uniform Trade Secrets Act. (DE # 1.) In response, Swanel brought two counterclaims, alleging that Bodemer breached the confidentiality agreement (DE # 11), and that Bodemer violated the Indiana Uniform Trade Secrets Act. (*Id.*)

Bodemer has now moved for summary judgment on all of his claims requesting declaratory relief, and on both of Swanel's counterclaims. (DE ## 34, 35.)

## II. ANALYSIS

The court will begin its analysis with Bodemer's motion for summary judgment on Swanel's two counterclaims. It will then conclude with an analysis of Bodemer's motion for summary judgment on his declaratory action claims.

### BODEMER'S MOTION FOR SUMMARY JUDGMENT ON SWANEL'S COUNTERCLAIMS

#### A. Legal Standard

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing that there is an absence of evidence to support the non-moving party's case. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex,* 477 U.S. at 323). To

overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986)). The nonmoving party must show that there is evidence upon which a jury reasonably could find for him. *Id.*

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

**B. Trade Secrets Counterclaim**

Count Two of Swanel's counterclaim asserts that Bodemer violated the Indiana Uniform Trade Secrets Act ("IUTSA"), IND. CODE 24-2-3, by misappropriating Swanel's trade secrets. Bodemer's first and only argument on this issue is that he is entitled to summary judgement because the "materials Swanel seeks to define as trade secrets are not covered under the [IUTSA's] definition" of trade secret. (DE # 35 at 20.)

The IUTSA defines a trade secret as:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

IND. CODE 24-2-3-2. A protectable trade secret therefore has four characteristics: "(1) information, (2) which derives independent economic value, (3) is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy." *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 179 (Ind. Ct. App. 2007). The determination of whether information constitutes a trade secret is a question of fact.[3]

---

[3] "'The fixing of the boundary between questions of law and questions of fact, is a matter of federal procedural law and therefore governed by federal rather than state law in diversity as in other federal suits.'" *Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 594 (7th Cir. 2009) (quoting *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir.

Here, Swanel contends that the following pieces of information constitute trade secrets under the IUTSA: (1) Swanel's list of distributors[4] (DE # 41 at 4); (2) Swanel's information regarding the requirements and sales volumes of its distributors (*id.*); (3) Swanel's "product recipes, product formulations, the methods by which they were developed and the companies with whom Swanel worked to develop them" (DE # 50-1 at 4); (4) the identity of Swanel's flavor house (DE # 41 at 6); (5) Swanel's information about the regions and locations where Banzai products are "more easily sold" (*id.* at 7); (6) Swanel's pricing structure and costs of producing its products (*id.* at 7); and (7) the identity of Swanel's raw materials suppliers and the pricing arrangements Swanel had with each (*id.* at 4). The court will address each piece of information in turn.

---

1996)); *see also Gutta v. Standard Select Trust Ins. Plans*, 530 F.3d 614, 618 (7th Cir. 2008). On the issue of whether a trade secret constitutes a question of fact or a question of law, the Seventh Circuit has stated:

> The existence of a trade secret ordinarily is a question of fact. As aptly observed by our colleagues on the Fifth Circuit, a trade secret "is one of the most elusive and difficult concepts in the law to define." *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.,* 569 F.2d 286, 288 (5th Cir. 1978). In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances. For this reason, the question of whether certain information constitutes a trade secret ordinarily is best "resolved by a fact finder after full presentation of evidence from each side." *Id.* at 289.

*Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003).

[4] These distributors buy products from Swanel and sell those products to bars and restaurants. (*See* DE # 51-2 at 2.) The court will use the term distributor in this opinion to refer to any client that Swanel sells its products to.

### 1. Swanel's List of Distributors

Indiana courts have recognized that under certain circumstances, a customer list can constitute a protectable trade secret under the IUTSA.[5] *See e.g.*, *Ackerman v. Kimball Int't., Inc.,* 634 N.E.2d 778, 782–85 (Ind. Ct. App. 1994), *aff'd,* 652 N.E.2d 507 (Ind. 1995) (customer lists, supplier lists, and pricing information may be trade secrets); *Michels v. Dyna–Kote Indus., Inc.,* 497 N.E.2d 586, 588–89 (Ind. Ct. App. 1986) (recognizing that customer lists may be protectable trade secrets); *Kozuch v. CRA–MAR Video Ctr., Inc.,* 478 N.E.2d 110, 113–14 (Ind. Ct. App. 1985) (same).

Bodemer contends that the identities of Swanel's distributors are not trade secrets because their identities are attainable from other sources. (DE # 44 at 11.) Specifically, Bodemer argues that because Swanel solicits its distributors at trade shows, advertises in trade magazines, and cold calls its customers, the identity of Swanel's customers cannot be a trade secret because this information is ascertainable by other proper means. (*Id.*)

Bodemer is correct that information that is "generally known, or readily ascertainable by proper means" does not constitute trade secret information. *Steve Silveus Ins., Inc.*, 873 N.E.2d at 179. The Indiana Supreme Court has held that "where the

---

[5] "When interpreting state law, a federal court's task is to determine how the state's highest court would rule." *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). It is also proper for a federal court to defer to state appellate courts, unless there is a "persuasive indication[ ] that the state supreme court would decide the issue differently." *Id.* (quoting *Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 952 (7th Cir. 2004)).

duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found 'not being readily ascertainable' so as to qualify for protection under the Indiana Uniform Trade Secrets Act." *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 919 (Ind. 1993).

Bodemer cites to *M.K. Plastics Corp. v. Rossi* in support of this argument. 838 N.E.2d 1068 (Ind. Ct. App. 2005). In that case, the Indiana Court of appeals refused to disturb the trial court's ruling that certain customer information was not a trade secret because it was available on the internet and association directories. *Id.* at 1076-77. But in this case, the fact that Swanel advertises in trade publications does not mean that its distributors' identities are available through those publications. In the Rossi case, the customer information was actually listed in the trade publications. *Id.* Bodemer has not presented evidence that Swanel's distributors are listed in trade publications. He has only argued that Swanel advertises in trade publications.

Additionally, the fact that Swanel's distributors could possibly be identified by a competitor attending trade shows, advertising in trade publications, or cold calling businesses does not necessarily mean that those distributors' identities are readily ascertainable. As noted above, "where the duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found 'not being readily ascertainable' so as to qualify for protection under the Indiana Uniform Trade Secrets Act." *Laird*, 622 N.E.2d at 919. A reasonable jury could conclude that it would take a substantial investment of time,

expense, or effort to identify Swanel's customers by attending trade shows, advertising in trade publications, and making cold calls. Therefore Bodemer's argument here must fail.[6]

Moreover, Bodemer has presented no evidence that distributors in the beverage industry are willing to "shop around" or reveal competing bids from competitors. *Cf. Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1094 (N.D. Ind. 1998). Furthermore, the beverage industry is not one where the distributors are "a group of readily identifiable customers or clients." *See Hydraulic Exch. and Repair, Inc. v. KM Specialty Pumps, Inc.*, 690 N.E.2d 782, 786 (Ind. Ct. App. 1998). As Bodemer points out in his reply brief, there are "tens of thousands, if not hundreds of thousands" of distributors in the beverage industry. (DE # 44 at 14.)[7]

---

[6] Bodemer does make a specific argument about one of Swanel's distributors, Kam's of Champaign, Illinois. (DE # 35 at 23.) Bodemer argues that the identity of Kam's cannot be a trade secret because Kam's was a distributor of Bodemer's former employer, T&C Carbonics, and only became one of Swanel's distributors after Swanel purchased T&C Carbonics. (DE # 35 at 23.)

Although Bodemer may have known Kam's identity prior to his employment with Swanel, he has presented no evidence showing that Kam's identity as one of Swanel's distributors would be accessible to a reasonably diligent competitor. *Laird*, 622 N.E.2d at 918 ("'[t]he first and [most significant] consideration is whether the . . . information is readily accessible to a reasonably diligent competitor.'" (quoting *Surgidev Corp. v. Eye Tech. Inc.*, 648 F. Supp. 661, 682 (D. Minn. 1986))).

[7] Bodemer cites to *Steenhoven v. College Life Insurance Co. of America* in support of his argument that Swanel's distributor list is not trade secret information. 460 N.E.2d 973, 975 n.7 (Ind. Ct. App. 1984). In that case, the Indiana Court of Appeals concluded that an insurance company's policyholder list was not a trade secret because the list lacked independent economic value. *Id.* at 974-75. The language that Bodemer cites to comes in a footnote after the court had already determined the list in that case did not constitute trade secret information, *id.* at 975 n.7, and subsequent Indiana appellate decisions indicate that customer lists that are not insurance company policyholder lists

In sum, the facts presented could allow a reasonable jury to conclude that Swanel's distributor list is a trade secret.[8] Thus, Bodemer has not met his initial burden on summary judgment, and his motion as it pertains to this information is **DENIED**.

### 2. Swanel's Distributors' Supply Requirements

Swanel also contends that information regarding the supply requirements of Swanel's distributors constitutes a trade secret. (DE # 41 at 4.) Bodemer makes no argument that this information is not a trade secret in either his brief in support of his motion for summary judgment or his reply brief. Thus, Bodemer's motion for summary judgment as to this piece of information is **DENIED**.

### 3. Swanel's Product Formulas, Product Recipes, and Production Techniques

As to the formula for Swanel's Banzai energy drink, which comes from Swanel's outside flavor house[9] ("the flavor house"), Bodemer asserts, and Swanel does not dispute, that Swanel does not know the formula for Banzai. (DE # 44 at 12; DE # 36-1 at 43.) Because Bodemer has shown Swanel does not actually know the make up of that

---

can be trade secrets under Indiana law. *See Ackerman,* 634 N.E.2d at 782–84, *aff'd,* 652 N.E.2d 507; *Kozuch,* 478 N.E.2d at 113–14; *see also KM Specialty Pumps, Inc.,* 690 N.E.2d at 786 (customer list was not a trade secret when customers were readily identifiable in a discrete market).

[8] Bodemer also asserts that he did not take any documents of any kind when he left swanel. (DE # 35 at 22.) Bodemer, however, "need not possess this information in a tangible form . . . for this type of information to qualify as trade secrets under Indiana law." *Bridgestone/Firestone, Inc. v. Lockhart,* 5 F. Supp. 2d 667, 681 (S.D. Ind. 1998).

[9] "In the beverage and drink industry, a flavor house is the independent business that assists in the formulation of the raw ingredients for the creation of a drink . . ." (DE # 50-2 at 5.)

formula, Bodemer has met his initial burden on summary judgment. Swanel has not presented any facts or arguments as to why this information constitutes a trade secret, and the court concludes that no reasonable jury could find that the formula for Banzai is a trade secret. Therefore, Bodemer's motion for summary judgment on this piece of information is **GRANTED.**

Bodemer also argues that the Banzai's product recipe is not a trade secret. (DE # 44 at 12.) Bodemer bases this argument on testimony Swanel President Edward Roviaro gave during a deposition. Roviaro was asked if (other than the energy drink formula produced by the flavor house) there were any secrets involved in the energy drink production process. Roviaro responded: "No. I think the packing of it is I don't think any kind of big secret. Sugar and water and flavoring." (DE # 36-1 at 41.) Roviaro was then asked if he agreed that the secret of the energy drink was the "essence."[10] (*Id.*) He responded: "Yes. Oh, yeah." (*Id.*)

Bodemer has not, however, provided any case that indicates that one person's subjective belief about the secrecy of a potential trade secret is dispositive on the issue of trade secret protection. At best, this information indicates that there is still a question of fact regarding whether the product recipe is a trade secret. Therefore, Bodemer has not met his initial burden here and his motion as to the Banzai product recipe is **DENIED**.

---

[10] This is the formula Swanel receives from the flavor house. (DE # 35 at 16.)

Bodemer makes a similar argument as to the Banzai production techniques. (DE # 44 at 13.) He points to the same "no big secret" testimony from Roviaro's deposition. (*Id.*) Additionally, he argues that Swanel has provided no evidence that Bodemer was familiar with the Banzai production process. (*Id.*)

The "no big secret" argument fails for the same reason stated above. As for the argument that Bodemer was not familiar with the production process, that argument is best saved for an analysis of whether Bodemer misappropriated this information. But, as Bodemer makes clear, his motion for summary judgment is limited to arguing that Swanel has no protectable trade secrets. (DE # 35 at 17.) Thus, Bodemer has not met his initial burden here, and his motion for summary judgment as to this piece of information is **DENIED**.

Bodemer has made no arguments about recipes and production techniques for products other than Banzai, and to the extent that Swanel is asserting that this information constitutes trade secret information (DE # 41 at 5), Bodemer's motion for summary judgment is **DENIED**.

### 4. The Identity of Swanel's Flavor House

Bodemer argues that the identity of Swanel's flavor house is not a trade secret. (DE # 44 at 13.) He argues that it is undisputed that Swanel's flavor house is well known in the beverage industry, and more specifically, that Swanel's flavor house is well known for its energy drinks. (*Id.*; DE # 36-4 at 9-10.) Bodemer also points to testimony that Swanel did not take steps to protect the identity of its flavor house

(DE # 50-3 at 3), and therefore did not make reasonable efforts to maintain the secrecy of this information. *Steve Silveus Ins., Inc.*, 873 N.E.2d at 179.

As noted above, one of the requirements for information to constitute a trade secret is that the information "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." IND. CODE 24-2-3-2. "The owner of the alleged trade secret must take reasonable, though not overly extravagant, measures to protect its secrecy[,]" and absolute secrecy is not required. *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 247 (Ind. Ct. App. 2001).

In support of his argument that Swanel did not maintain the secrecy of its flavor house's identity, Bodemer points to the fact that one of Swanel's distributors learned the identity of Swanel's flavor house when the distributor received a shipment from Swanel that had a label identifying the flavor house. (DE # 50-3 at 3.) Additionally, potential Swanel distributors were often given tours of the Swanel warehouse that contained cartons labeled with the name of Swanel's flavor house. (DE # 36-2 at 21.) Taken alone, these facts would not allow a reasonable jury to determine that Swanel took reasonable efforts to protect the secrecy of its flavor house. Thus, Bodemer has met his initial burden of showing no genuine issue of material fact exists as to whether the identity of Swanel's flavor house is a trade secret.

Swanel, however, has presented evidence that it had all employees sign confidentiality agreements covering business information learned through employment with Swanel. (DE # 41 at 7; DE # 50-6 at 2.) As noted above, all that Swanel was

required to do under Indiana law was to "take reasonable, though not overly extravagant, measures to protect its secrecy." *Zemco*, 759 N.E.2d at 247. Under the facts presented, a reasonable jury could conclude that the secrecy element of the trade secret test has been met.

Bodemer also makes an argument that because Swanel's flavor house is well known in the beverage industry for its energy drinks, the flavor house's identity is not a trade secret. (DE # 44 at 13.) Bodemer argues that this leads to the conclusion that the identity of this flavor house as a provider of formulas for energy would be readily ascertainable information, thus taking this information outside the protection of the IUTSA. *Steve Silveus Ins., Inc.*, 873 N.E.2d at 179. Bodemer has not, however, provided evidence regarding whether the flavor house market is discrete or whether this particular flavor house would be readily identifiable by one of Swanel's competitors. *KM Specialty Pumps, Inc.*, 690 N.E.2d at 786.

Additionally, any economic value that a competitor, like Bodemer, would gain from this information is not merely from the knowledge of the flavor houses's existence, but also from the knowledge that this flavor house was *Swanel's flavor house*. The fact that the flavor house was well known in the industry does not mean that the flavor house was well known in the industry for being Swanel's flavor house. A competitor seeking to replicate a Swanel product would be able to do so more quickly knowing which flavor house Swanel had used to develop that product.

A reasonable jury could conclude that the identity of Swanel's flavor house is a trade secret. Therefore, Bodemer has not met his initial burden and his motion for summary judgment as to this piece of information is **DENIED**.

### 5. The Pricing Arrangements Swanel Had With Its Suppliers / Locations Where Swanel Has Higher Sales Volume / Profits from Distributors / Product Cost Information / Product Pricing Structure

Swanel contends that the following pieces of information constitute trade secrets under the IUTSA: product cost / pricing information (DE # 41 at 5), product sales / profit information (*id.* at 7), and the areas where Swanel's products are sold more easily.[11] (*Id.*) Bodemer makes two arguments as to why this information does not constitute trade secret information.

First, Bodemer argues that pricing methods for energy drinks are well known throughout the beverage industry. (DE # 44 at 14.) That may be true, but Swanel contends that the actual pricing structure of its products is a trade secret (DE # 41 at 7), not the method that it uses to develop those pricing structures. Thus, Bodemer's argument on this issue is inapposite.

Bodemer also argues that he has not retained any sort of written documentation of any of this information. That may also be true, but Bodemer "need not possess this

---

[11] Indiana courts have held information including pricing information (sales and profits) and supplier lists can be trade secrets. *KM Specialty Pumps, Inc.*, 690 N.E.2d at 786; *Ackerman,* 634 N.E.2d at 782–85, *aff'd,* 652 N.E.2d 507; *see also Lockhart*, 5 F. Supp. 2d at 681 (recognizing that "[k]nowledge of financial information indicating the company's strengths and weaknesses, its production and marketing costs, its sales information and profit margins broken down by product, by customer, by salesperson, and by region" may qualify as protectable trade secrets).

information in a tangible form or recall precise numbers for this type of information to qualify as trade secrets under Indiana law." *Lockhart*, 5 F. Supp. 2d at 681.

A reasonable jury could conclude that this information constitutes protectable trade secret information, and thus, Bodemer has not met his initial burden on his motion for summary judgment. Bodemer's motion for summary judgment as to this information is **DENIED**.

### C. Breach of the Confidentiality Agreement

Bodemer has also moved for summary judgment on Swanel's counterclaim for breach of the confidentiality agreement. (DE # 35 at 17.) The language of the confidentiality agreement that is at issue here states:

> All business information and materials containing business information from SWANEL to EMPLOYEE, or learned through his employment by SWANEL including, but not limited to names of present or prospective customers or of persons that have or shall have dealt with SWANEL or have purchased SWANEL PRODUCTS, management, information reports, and other computer generated reports, details, operational methods, plans of strategies, business acquisition plan, and other business affairs of SWANEL learned by EMPLOYEE heretofore or hereafter are, and shall be treated as confidential. Employee shall keep that information and those materials confidential and retain them in the strictest confidence both during and after the term of his or her employment. EMPLOYEE shall return to SWANEL all information and material [sic] and all copies thereof immediately up [sic] termination of his or her employment.

(DE # 1-2 at 3.)

Bodemer argues that several defects render this provision unenforceable. First he argues that the provision is overly broad because it lacks durational and geographic restrictions. Second, he argues the provision is overly broad because it applies to past,

present, and future Swanel customers. Finally, he argues that the provision is overly broad because Swanel intends to use the provision to prevent him from using his general skills and knowledge about the beverage industry in future employment. (DE # 35 at 10-17.)

Despite the fact that the confidentiality agreement at issue in this case is a separate provision from the agreement's covenant not to compete,[12] it is clear from the language of the confidentiality agreement that the confidentiality agreement's effect is essentially that of a covenant not to compete. The provision requires Bodemer to keep confidential all business information that he learned during his employment at Swanel, and thus, would likely make it impossible for him to hold any non-menial[13] position in the beverage industry.[14] Therefore, the court will analyze the enforceability of the

---

[12] As Swanel correctly asserts in its response brief, confidentiality agreements and non-compete agreements are two distinct legal concepts. *See e.g.*, *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 760-61 (Iowa 1999) ("Nondisclosure-confidentiality agreements enjoy more favorable treatment in the law than do noncompete agreements."); Terry Morehead Dworkin & Elletta Sangrey Callahan, *Buying Silence*, 36 AM. BUS. L.J. 151, 155 ("Confidentiality provisions are distinguishable from anti-competition clauses.").

[13] Notably, the provision is broad enough to prevent Bodemer from using or disclosing general knowledge or skills that he learned while at Swanel.

[14] The provision requires Bodemer to keep confidential "[a]ll business information . . . learned through his employment by SWANEL . . . ." (DE # 1-2 at 3.) That provision would make it nearly impossible for Bodemer to hold a position in the beverage industry.

Swanel has recognized the effect of the provision's broad language. In a letter sent by Swanel's counsel to Bodemer dated March 10, 2009, Swanel's counsel wrote: "We believe it probably would not be possible for you to avoid violation of the Non-Compete/Confidentiality Agreement and/ or the [IUTSA] should you decide to work with any business in direct competition with Swanel . . . ." (DE # 1-2 at 9); *Harvest Ins.*

provision under Indiana law concerning covenants not to compete. *Carolina Chem. Equip. Co., v. Muckenfuss*, 471 S.E.2d 721, 723 (S.C. Ct. App. 1996) (subjecting confidentiality provision that would severely restrict employee's employment opportunities to covenant not to compete analysis).

Covenants not to compete are restraints of trade and are not favored under Indiana law. *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005); *Inter-Ocean Ins. Co.*, 492 N.E.2d at 689. Covenants not to compete are strictly construed against the employer and are only enforced if reasonable. *See Inter-Ocean Ins. Co.*, 492 N.E.2d at 688. In *Inter-Ocean Insurance Co.*, the Indiana Supreme Court outlined the test Indiana courts apply in determining if a covenant not to compete is enforceable:

> Such covenants are deemed reasonable only where the restraint is reasonably necessary to protect the employer, is not unreasonably restrictive of the employee and is not against public policy. . . . The determination of the reasonableness of the restraint focuses on the legitimate interests of the employer which might be protected and the protection granted by the covenant in terms of time, space and the types of activity proscribed." (citation omitted).

---

*Agency, Inc. v. Inter-Ocean Ins. Co.*, 492 N.E.2d 686, 689 (Ind. 1986) (Indiana courts look to entire contract and the "situation to which it is related" in determining the validity of a covenant not to compete); *see also Press-A-Dent, Inc. v. Weigel,* 849 N.E.2d 661, 669-70 (Ind. Ct. App. 2006) (taking note of letter threatening legal action).

In another letter from Swanel's attorneys to Bodemer, Swanel made it clear that it believes that opening a competing company is itself a breach of the confidentiality agreement: "Furthermore, because the information you possess is confidential and integral to the operation of Swanel . . . . your operation of a competing business is a *de facto* breach of your promise in the Agreement to maintain the confidentiality of Swanel's confidential corporate and business information." (DE # 1-2 at 8.)

*Inter-Ocean Ins. Co.*, 492 N.E.2d 688-89.[15] Under Indiana law, the reasonableness of a

covenant not to compete is a question of law.[16] *Cent. Ind. Podiatry, P.C. v. Krueger*, 882

N.E.2d 723, 729 (Ind. 2008).

"To demonstrate a legitimate protectable interest, 'an employer must show some

reason why it would be unfair to allow the employee to compete with the former

employer.'" *Macy*, 795 N.E.2d at 1110 (quoting *Unger v. FFW Corp.*, 771 N.E.2d 1240,

1244 (Ind. Ct. App. 2002). Indiana courts have found customers relationships and

---

[15] In *Coffman v. Olson & Co., P.C.*, the Indiana Court of Appeals went into a more detailed summary of Indiana law concerning covenants not to compete:

> Indiana courts have generally recognized and respected the freedom to contract. However, covenants not to compete are in restraint of trade and are not favored by the law. Noncompetition agreements are strictly construed against the employer and are enforced only if reasonable. Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. To determine the reasonableness of the covenant, we first consider whether the employer has asserted a legitimate interest that may be protected by a covenant. If the employer has asserted such an interest, we then determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. The employer bears the burden of showing that the covenant is reasonable and necessary in light of the circumstances. In other words, the employer must demonstrate that the former employee has gained a unique competitive advantage or ability to harm the employer before such employer is entitled to the protection of a noncompetition covenant.

906 N.E.2d 201, 207 (Ind. Ct. App. 2009) (quoting *Pathfinder Commc'ns Corp. v. Macy*, 795 N.E.2d 1103, 1109 (Ind. Ct. App. 2003)).

[16] Unlike the issue of whether the existence of a trade secret is a question of law or fact, the court cannot find any Seventh Circuit case law that indicates that the reasonableness of a covenant not to compete is a question of fact. The court will also assume that the reasonableness of a confidentiality agreement is a question of law. *See Brunner v. Hand Indus., Inc.*, 603 N.E.2d 157, 160 (Ind. Ct. App. 1992) (reasonableness of covenant containing non-disclosure agreement is question of law).

goodwill between a business and its customers to be protectable interests. *See id.*; *see also Krueger*, 882 N.E.2d at 729. Indiana courts, however, also recognize that "an employee signing a restrictive covenant not to compete is entitled to utilize the general skills he has acquired in performing his job, and can only be prevented from doing so under circumstances where their use adverse to his employer would result in irreparable injury." *Macy*, 795 N.E.2d at 1110 (citations and quotations omitted).

Covenants not to compete must be limited in scope. Indiana courts have struck down covenants not to compete that extend indefinitely. *Inter-Ocean Ins. Co.*, 492 N.E.2d at 689-90 ("The lack of a reasonable time restraint is enough to render a non-competition covenant void and unenforceable."); *see also Coll. Life Ins. Co. of Am. v. Austin*, 466 N.E.2d 738, 744 (Ind. Ct. App. 1984). Indiana courts have also struck down covenants not to compete that lack a geographic limitation. *See Vukovich v. Coleman*, 789 N.E.2d 520, 526 (Ind. Ct. App. 2003); *see also Austin*, 466 N.E.2d at 744. Indiana courts, however, may uphold a covenant not to compete that lacks a geographic limitation "if its reach is adequately limited by other means." *Vukovich*, 789 N.E.2d at 526.

Although Indiana courts are reluctant to enforce covenants not to compete that lack geographic limitations, they are more willing to enforce broad restrictive covenants when those covenants protect trade secret or confidential information. *See Donahue v. Permacel Tape Corp.*, 127 N.E.2d 235, 237 (Ind. 1955) ("It is admitted that an employee who is entrusted with 'trade secrets' may make a valid covenant against the competitive use or disclosure of such trade secrets to the full extent of the affected area of the

business of the employer."); *4408, Inc. v. Losure*, 373 N.E.2d 899, 902 (Ind. Ct. App. 1978) ("Absent special circumstances, such as the employee's possession of trade secrets, a covenant not to compete which is broader in scope than the area of the employee's work will be deemed unenforceable."); *Waterfield Mortg. Co. v. O'Connor*, 361 N.E.2d 924, 927 (Ind. Ct. App. 1977) ("However, if an employee obtained confidential information, he may be restricted in the competitive use and disclosure of such information to the full extent of the employer's business which is thereby affected.").

It is undisputed that the provision in the case at hand contains neither durational nor geographic limitations. If a covenant not to compete lacks a geographic limitation, but covers trade secrets, a court reviewing the provision must still go through the same analysis that it would for any other covenant not to compete. *Ackerman v. Kimball Int't., Inc.,* 652 N.E.2d 507, 510 (Ind. 1995) ("We think that once it is established that trade secrets are involved, and when the covenant not to compete contains no geographic limitation, it must still be inquired further whether that lack of geographic limitation—together with all the other provisions of the covenant—is reasonably necessary to protect the employer, is not unreasonably restrictive of the employee, and is not against public policy."). For the purposes of this analysis, the court will assume that Swanel possesses trade secrets or other confidential information.

As to the first step of the analysis, Swanel asserts that it has legitimate protectable interests in the good will and relationships it has with its customers. Additionally, Swanel argues that it has a protectable interest in its trade secret and

confidential information. (DE # 41 at 9-10.) Indiana courts have found that confidential information and goodwill between a business and its customers to be protectable interests. *See Krueger*, 882 N.E.2d at 729; *Donahue*, 127 N.E.2d at 237-41; *see also Macy*, 795 N.E.2d at 1110. Swanel also argues that Bodemer has developed a unique competitive advantage because Bodemer was so intricately involved with Swanel's business for so many years. (DE # 50-1 at 7.) Bodemer makes no argument that Swanel has failed to assert legitimate interests that can be protected by a covenant not to compete. Thus, the court will move on to determine whether the scope of the agreement is reasonable.

The provision in this case extends indefinitely and has no geographic limitation whatsoever. Although Indiana courts allow broader restrictions in covenants not to compete when those covenants protect trade secret or confidential information, they only do so to the "affected area of the business of the employer." *Donahue*, 127 N.E.2d at 237; *see also O'Connor*, 361 N.E.2d at 927 ("However, if an employee obtained confidential information, he may be restricted in the competitive use and disclosure of such *information to the full extent of the employer's business which is thereby affected*." (emphasis added)). Swanel has not provided the court with any cases that indicate a covenant not to compete that protects trade secrets or other confidential information can apply to the entire world.[17]

---

[17] Swanel does cite to *Slisz v. Munzenreider Corp.* in support of its argument that its restrictive covenant is reasonable. 411 N.E.2d 700 (Ind. Ct. App. 1980). That case recognized that covenants not to compete that contain confidential or trade secret information permit a "*somewhat broader* restriction than may otherwise be allowed." *Id.* at 708 (emphasis added) That case does not stand for the proposition that a covenant

Swanel has presented no evidence that it does business outside of the United States. This provision, however, would prevent Bodemer from working for a beverage company in China or Germany. Thus, the provision as written "'could apply to the entire world[.]'" *Vukovich*, 789 N.E.2d at 526 (quoting *Struever v. Monitor Coach Co.*, 294 N.E.2d 654, 656 (Ind. Ct. App. 1973).[18] Although Swanel does have legitimate interests to protect, the court concludes that the covenant as written is unreasonable because it extends far beyond what is necessary to protect those interests. *Austin*, 466 N.E.2d at 744 ("[W]hatever restraint is larger than necessary for the protection of the party, is void, as being injurious to the interests of the party."); *see also Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 816 (S.D. Ind. 2007) (noting that Indiana has "a public policy against contracts that unreasonably restrain trade."). A global ban on Bodemer working in the beverage industry is not necessary to protect Swanel's interests.

Swanel argues that if the confidentiality provision in its contract with Bodemer is determined to be unreasonable, the court should strike, or "blue pencil," the unreasonable terms and enforce the rest of the provision. (DE # 41 at 16.) In *Licocci v. Cardinal Assos., Inc.*, the Indiana Supreme Court summarized its position on blue penciling covenants not to compete:

---

not to compete that protects trade secret or confidential information can be unlimited in scope.

[18] A covenant not to compete that contains no geographic limitation may still be reasonable if it is limited by other means. *Vukovich*, 789 N.E.2d at 526. The provision in this case contains no other restrictions. It requires Bodemer to keep confidential all business information Bodemer learned during his employment at Swanel and the identity of anyone who has ever dealt with Swanel.

> If the covenant as written is not reasonable, the courts may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they had not made. . . . However, if the covenant is clearly separated into parts and some parts are reasonable and others are not, the contract may be held divisible. The reasonable restrictions may then be enforced.

445 N.E.2d 556, 561 (Ind. 1983) (quotations omitted).

Since then, Indiana appellate courts have refined the "blue pencil" doctrine. For example, Indiana courts will not "add terms that were not originally part of the agreement." *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 811 (Ind. Ct. App. 2000). "Rather, 'unreasonable restraints are rendered reasonable by scratching out any offensive clauses to give effect to the parties intentions.'" *Id.* (quoting *Smart Corp. v. Grider*, 650 N.E.2d 80, 83-84 (Ind. Ct. App. 1995).

For this provision to be reasonable, the court would need to add a provision that somehow restricted its scope geographically. The court, however, may not "add terms that were not originally part of the agreement." *Burk*, 737 N.E.2d at 811. Thus, the agreement is unenforceable in its entirety.[19]

Even if the court were to analyze this provision as a strict confidentiality agreement, it would still be unenforceable. In analyzing the provision as a strict

---

[19] Although not clearly articulated, any argument that Swanel has that the court may revise the confidentiality agreement beyond what Indiana precedent allows because it has a provision in the agreement that specifically directs a court reviewing the agreement to revise the agreement to make it enforceable, that argument has been rejected by the Indiana Court of Appeals. *See Sharvelle v. Magnante*, 836 N.E.2d 432, 439 (Ind. Ct. App. 2005) (despite explicit provision allowing court to modify terms of covenant if it was found to be unreasonable, court was still unwilling to add terms that were not part of original agreement).

confidentiality agreement, the court must determine how the Indiana Supreme Court would rule on this issue, *Rodas*, 656 F.3d at 626, even though the court has very limited guidance[20] from Indiana appellate courts. Because Indiana case law analyzing confidentiality agreements is limited, the court will look to other jurisdictions for guidance. *Amerisure, Inc. v. Wurster Const. Co., Inc.*, 818 N.E.2d 998, 1004 (Ind. Ct. App. 2004), *abrogated on other grounds by Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160 (Ind. 2010).

Courts take differing approaches when analyzing the enforceability of confidentiality agreements.[21] Some courts that require durational or geographic limitations for covenants not to compete do not require those same limitations for confidentiality agreements. *See, e.g., Papa John's Int'l, Inc. v. Pizza Magia Int'l, LLC*, No. CIV.A. 3:00CV–548–H, 2001 WL 1789379, at *3 (W.D. Ky. 2001) ("While not all states accord nondisclosure agreements such deference, this Court agrees with the majority view that nondisclosure agreements implicate far fewer public policy concerns [than

---

[20] The court was able to find one case that dealt with the enforceability of a confidentiality agreement in isolation. *Brunner*, 603 N.E.2d at 157. The agreement in that case was invalidated because there was no showing that the employee was exposed to any confidential information and because the agreement also had a clause requiring the employee to reimburse the employer if the employee left his employment prior to a certain date. *Id.* at 159-61. Although the applicability of *Brunner* to the case at hand is limited, it will be discussed later in the opinion.

[21] Confidentiality agreements are also known as non-disclosure agreements. *See, e.g.*, Norman D. Bishara & David Orozco, *Using the Resource-Based Theory To Determine Covenant Not To Compete Legitimacy*, 87 IND. L.J. 979, 988 (2012); Ryan M. Philp, *Silence At Our Expense: Balancing Safety and Secrecy in Non-Disclosure Agreements*, 33 SETON HALL L. REV. 845, 850 n.34 (2003).

covenants not to compete] and should receive more deferential review."); *see also Revere*

*Transducers*, 595 N.W.2d at 760-62 (covenants not to compete must be limited in both

time and area but absence of limitations on time and area do not render confidentiality

agreements presumptively unenforceable); *Bernier v. Merrill Air Eng'rs*, 770 A.2d 97, 104

(Me. 2001) ("We do not find that durational limits are necessary in nondisclosure

clauses, as they are in noncompete agreements, because the imposition of geographic or

durational limitations would defeat the entire purpose of restricting disclosure, since

confidentiality knows no temporal or geographical boundaries." (citations and

quotations omitted)); *Chemimetals Processing, Inc. v. McEneny*, 476 S.E.2d 374, 376-77

(N.C. Ct. App. 1996) ("An agreement is not in restraint of trade . . . [if it] seeks to

prevent the disclosure or use of confidential information. Such agreements may,

therefore, be upheld even though the agreement is unlimited as to time and area . . . ."

(citations omitted)). Other courts require confidentiality agreements to have durational

or geographic limitations. *See, e.g.*, *Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC.* 733

F. Supp. 2d 980, 983-84 (E.D. Wis. 2010) (noting that under Wisconsin law,

confidentiality agreements that seek to restrain competition are subject to state statute

that requires covenants not to compete to have durational and geographic limits to be

enforceable).

The court believes that the Indiana Supreme Court would analyze a

confidentiality agreement in a way similar to the way that Indiana courts analyze

covenants not to compete. *See Brunner*, 603 N.E.2d at 159. Therefore, the court will look

to the same test that Indiana courts look to in determining the reasonableness of

covenants not to compete: confidentiality agreements "must be reasonable with respect

to the legitimate interests of the employer, restrictions on the employee, and the public

interest." *Coffman,* 906 N.E.2d at 207. The court will assume, for the sake of argument,

that the Indiana Supreme Court would not require geographic or durational limits for a

confidentiality agreement to be reasonable.[22] *See Revere Transducers*, 595 N.W.2d at 760-

62 (applying a similar test and concluding that lack of geographic or durational

restrictions does not render confidentiality agreement presumptively unenforceable).

Finally, as Indiana courts have shown substantial deference to covenants not to compete

that involve trade secrets, the court believes that the Indiana Supreme court would give

---

[22] This may be a generous assumption. The Indiana Supreme Court has indicated that provisions, like the one at issue here, that prevent employees from using general knowledge and skill in future employment may be limited only to the area that the employee actually worked. The *Donahue* court stated:

> Knowledge, skill and information (except trade secrets and confidential information) become a part of the employee's personal equipment. They belong to him as an individual for the transaction of any business in which he may engage, just the same as any part of the skill, knowledge, information or education that was received by him before entering the employment. Therefore, on terminating his employment he has a right to take them with him. These things cannot be taken from him, although he may forget them or abandon them. *An employee may contract to conditionally forego these personal attainments as a consideration for his employment only where their use adverse to his employer would result in irreparable injury to the employer. This could occur only in the area of his employment.* Therefore, a covenant which would limit his employment with a competitor beyond the scope of his present employment is void.

127 N.E.2d at 240-41 (citations omitted) (emphasis added).

greater deference to a confidentiality provision that dealt with trade secret information. *Donahue*, 127 N.E.2d at 237; *see also 4408, Inc.*, 373 N.E.2d at 902.

As to the first step of the analysis, as noted above, Swanel has asserted interests, customer relationships, good will, and confidential or trade secret information, that have been found to be protectable under Indiana law. (DE # 41 at 9); *Krueger*, 882 N.E.2d at 729; *Macy*, 795 N.E.2d at 1110. Therefore, the court will proceed to analyze the restrictions on the employee.

Even assuming the lack of any durational or geographic restrictions is not dispositive on the issue of the reasonableness of the scope of the confidentiality agreement, the agreement still covers too much information and is unduly restrictive. A confidentiality agreement "cannot make secret that which is not secret . . . ." *Lanier Prof'l Servs., Inc. v. Ricci*, 192 F.3d 1, 5 (1st Cir. 1999). But the confidentiality agreement in this case does precisely that. Under the terms of the agreement, any and all business information that Bodemer learned during his time at Swanel must be treated as confidential. Swanel has not argued, and could not possibly argue, that every piece of information regarding its business is confidential. The provision makes no distinction between business information generally known to the public and business information that Swanel did in fact keep in confidence, and thus covers much more information than necessary to protect Swanel's legitimate interests. *Cf. Revere Transducers*, 595 N.W.2d at 762-63 (upholding nondisclosure agreement and noting that employee was "only

precluded from disclosing information that would not generally be known by the public.").[23]

Additionally, many courts have held that confidentiality provisions cannot be used to restrict an employees use of general knowledge or experience. *Kenyon Int'l Emergency, Servs., Inc. v. Malcolm,* No. H–09–3550, 2010 WL 2303328, at *2 (S.D. Tex. June 7, 2010 ("[Confidentiality agreements] are legitimate when used to protect truly proprietary information. [Plaintiff] in contrast, attempted to restrict the defendants' use of their experience. Experience is not confidential."); *Revere Transducers,* 595 N.W.2d at 762-63 ("[T]he restrictions concerning disclosure are sufficiently narrow in scope such that they do not interfere with [the employees'] ability to use skills and general knowledge they acquired through employment with [former employer] in future employment.").

Indiana courts seem to be in harmony with other courts that prohibit the use of restrictive covenants to prevent employees from using general knowledge or experience during future employment. In the one Indiana case the court was able to find that analyzed the enforceability of a confidentiality agreement, the Indiana Court of Appeals summarized Indiana case law regarding restrictive covenants that limit employees using general knowledge or experience in future employment and concluded that

---

[23] Hypothetically, if Bodemer interviewed for a job with one of Swanel's competitors, a company like Red Bull, after he left his job with Swanel, and was asked to list the products that Swanel sold, the confidentiality agreement would prevent Bodemer from answering the question, as the identity of Swanel's products would constitute "business information."

"[a]lthough an employer has a protectible property interest in the good will of his business (including secret or confidential information), the same is not true regarding the general knowledge, information or skills gained by the employee in the course of his employment." *Brunner*, 603 N.E.2d at 160.[24]

The confidentiality agreement here could be used to interfere with Bodemer's ability to use his general knowledge and skills in future employment because it covers any business information Bodemer learned while at Swanel, not just information that is confidential or trade secret information. Moreover, it is clear that Swanel has attempted to enforce the confidentiality provision in a way that would extend beyond keeping trade secret and other confidential information confidential. After Bodemer told Swanel he was leaving the company, Swanel had its counsel send Bodemer a letter reminding

---

[24] Additionally, in *Donahue*, the Indiana Supreme Court quoted a case from the Supreme Court of Maine with approval:

> (W)hile an employer, under a proper restrictive agreement, can prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment, and from enticing away old customers, he has no right to unnecessarily interfere with the employee's following any trade or calling for which he is fitted and from which he may earn his livelihood and he cannot preclude him from exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment. Public policy prohibits such undue restrictions upon an employee's liberty of action in his trade or calling.

127 N.E.2d at 241 (quoting *Roy v. Bolduc*, 34 A.2d 479, 480-81 (Me. 1943)). The Indiana Court of Appeals has also stated: "[The employer], however, is not entitled to protection from an employee's use of his knowledge, skill or general information acquired or increased through experience or even instructions while in the employment."*Captain and Co. v. Towne*, 404 N.E.2d 1159, 1162 (Ind. Ct. App. 1980).

Bodemer of the agreement he had previously signed. (DE # 1-2 at 5.) That letter stated:

"*[A]ll information* and materials you have received, encountered, and/or learned during your employment with Swanel must be treated and kept as confidential." (*Id.* (emphasis added); *see Inter-Ocean Ins. Co.*, 492 N.E.2d at 689 (Indiana courts look to entire contract and the "situation to which it is related" in determining the validity of a covenant not to compete); *see also Weigel,* 849 N.E.2d at 669-70 (taking note of letter threatening legal action).

In sum, even analyzing the provision under the more lenient confidentiality agreement standard, the provision is unenforceable under Indiana law because it is overly broad and unreasonable in light of the interests sought to be protected, and thus, is a restraint of trade that violates public policy. *See Austin*, 466 N.E.2d at 744 ("[W]hatever restraint is larger than necessary for the protection of the party, is void, as being injurious to the interests of the party."); *see also Dearborn*, 486 F. Supp. 2d at 816 (noting that Indiana has "a public policy against contracts that unreasonably restrain trade."); *Fumo v. Med. Grp. of Mich. City, Inc.*, 590 N.E.2d 1103, 1109 (Ind. Ct. App. 1992).[25]

---

[25] Swanel cites to *PepsiCo, Inc. v. Redmond* in support of its argument that the confidentiality agreement is enforceable. 54 F.3d 1262 (7th Cir. 1995). In that case, an employee left PepsiCo to work at a competitor, and PepsiCo filed suit seeking an injunction to prevent the employee from revealing trade secret and confidential information. *Id.* at 1264-65. PepsiCo also sought to enforce a confidentiality agreement that the employee had signed. *Id.*

Although the facts of that case may be similar to the facts of the case at hand, it lends Swanel little support. The former employee in *Redmond* did not argue, as Bodemer argues here, that the confidentiality agreement was unenforceable. *Id.* at 1271-

The blue pencil doctrine cannot be used to save this provision even when analyzed as a confidentiality agreement. Because the provision does not differentiate between confidential information and that information that is generally known, the court would have to insert language into the provision that would limit its enforceability to information that is actually confidential or trade secret information. *Cf. Revere Transducers*, 595 N.W.2d at 762-63 (upholding nondisclosure agreement and noting that employee was "only precluded from disclosing information that would not generally be known by the public."). Adding language that limited the provision's enforceability to confidential or trade secret information would also ensure that the provision would not prevent Bodemer from using general knowledge or skills in his future employment. But, as noted above, Indiana courts will not add terms that were not originally part of the agreement, *Burk*, 737 N.E.2d at 811, and the provision is unenforceable as a whole.

In sum, Bodemer has met his initial burden of showing that there is no genuine issue of material fact as to the enforceability of the confidentiality provision, and because the provision is unenforceable even if it covered trade secret or confidential information, Swanel has not met its burden of showing the presence of a genuine issue of material fact for trial.

---

72. Instead, the employee argued that "inevitable breaches" of confidentiality agreements may not be enjoined. *Id.* at 1272. Swanel, however, does not seek an injunction here, and *Redmond* does not support its argument that the provision in this case is reasonable.

As Swanel points out, however, under Indiana law, a covenant not to compete must be analyzed under the law of each state that has "a material interest in the transaction and the parties." *See Inter-Ocean Ins. Co.*, 492 N.E.2d at 690-91. Bodemer has only moved for summary judgment on this issue under the law of Indiana, and thus, is not entitled to summary judgment under the law of any other state. Therefore, Bodemer's motion for summary judgment as to Swanel's breach of contract counterclaim is **GRANTED** as to its enforceability under Indiana law, and **DENIED** as to its enforceability under the law of any other state.[26]

## BODEMER'S MOTION FOR SUMMARY JUDGMENT ON HIS OWN DECLARATORY JUDGMENT CLAIMS

### A. Legal Standard

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The parties' burdens in the context of a motion for summary judgment depend on whether the movant or the non-movant would ultimately bear the burden of proof on a disputed issue at trial. Where the movant would bear the burden of proof, the movant "must show that the evidence . . . is 'so one-sided that . . . [the movant] must prevail as a matter of law'" in order to obtain summary judgment in his favor. *Reserve Supply Corp. v. Owens-Corning*

---

[26] Although Bodemer did not move for summary judgment under the law of any other state, the expansive scope of the confidentiality agreement makes it unlikely that the provision would be found reasonable under another state's law.

*Fiberglass Corp.,* 971 F.2d 37, 42 (7th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 251-52 (1986)); *Addicks Servs., Inc., v. GGP-Bridgeland, LP,* 596 F.3d 286, 293
(5th Cir. 2010) (where movant also bears burden of proof, "movant must establish
beyond peradventure" all essential elements in order to warrant judgment in his
favor"); MOORE'S FED. PRACTICE 3d, § 56.13[1] (where party moves for summary
judgment and bears the burden of proof on the issue, it must show that the evidence is
so powerful that no reasonable jury would be free to disbelieve it).

 "[T]he allocation of the burden of proof in a diversity case (or any other case
governed by state law) is determined by state law." *James River Ins. Co. v. Kemper Cas.
Ins. Co.*, 585 F.3d 382, 384-85 (7th Cir. 2009). Under Indiana law, "the party seeking the
judgment in an action for declaratory judgment must carry the burden of proving its
propriety." *Sans v. Monticello Ins. Co.*, 718 N.E.2d 814, 819 (Ind. Ct. App. 1999). Thus, on
Bodemer's motion for summary judgment with regard to his declaratory judgment
claims, Bodemer "must show that the evidence . . . is 'so one-sided that . . . [the movant]
must prevail as a matter of law'" in order to obtain summary judgment in his favor.
*Reserve Supply Corp.*, 971 F.2d at 42 (7th Cir. 1992) (quoting *Liberty Lobby, Inc.*, 477 U.S. at
251-52).

### B. Covenant Not To Compete

 Bodemer has moved for summary judgment on his claim that seeks a declaration
that he complied with the covenant not to compete that he entered into with Swanel.
(DE # 35 at 4.) That covenant not to compete states:

> In the event that [Bodemer] ceases being an employee of SWANEL, INC. (SWANEL) than [sic] [Bodemer] agrees for a period of eighteen (18) months from his or last date of employment he . . . will not as an individual, partner, shareholder, officer, director, principal, agent, employer, trustee or consultant, solicit any customer of SWANEL. This non-compete agreement shall extend only for a radius of 100 miles from the present location of the company. In the event that a court find the above restriction unenforceable, it shall modify it to an enforceable limit.

(DE # 1-2 at 3.) Bodemer does not argue that this non-compete agreement is unreasonable. In fact, Bodemer concedes that the agreement is enforceable. (DE # 35 at 4.) Bodemer contends, however, that he has not violated the agreement, and seeks a declaratory judgment that states that he has complied with the non-compete agreement. (*Id.* at 4.)

In his statement of material facts, Bodemer makes clear that he "has not violated the terms of the [covenant not to compete]." (DE # 35-1 at 12; *see also* DE # 35 at 7 ("Bodemer has not solicited any Swanel customer within the limited geographic area within the specific time period.").) Swanel does not address this argument at all in its response brief. (DE # 41.) In fact, Swanel's only mention of the covenant not to compete comes in its statement of genuine issues, when Swanel states:

> Kam's may be within the 100 mile radius which applies to the non-competition of Bodemer's non-compete and confidentiality agreement with Swanel.

(DE # 50-1 at 10.) This mention comes under the section of Swanel's statement of genuine issues that deals with the issue of whether Swanel's confidentiality agreement is reasonable. (*Id.* at 7.)

Swanel's sole mention of this issue cites to the deposition testimony of Swanel President Edward Roviaro. (DE # 50-1 at 10.) During his deposition, Roviaro was asked about the covenant not to compete, (DE # 36-1 at 62), and he stated that although he was not sure which is longer, a statute mile or a nautical mile,[27] Kam's, located in Champaign, Illinois, was within 100 miles of Swanel's headquarters using the longer of the two measurements. (*Id.*)

In his statement of material facts, Bodemer also states that he measured the straight line distance between Kam's and Swanel, and that Kam's is 110 statute miles away from Swanel. (DE # 35-1 at 14.) Swanel does not dispute that Kam's is not within 100 statute miles of its headquarters, as a statute mile is the shorter of the two measurements. (DE # 50-1 at 10; DE # 36-1 at 62.) Swanel also does not present any argument or direct the court to any evidence that Bodemer violated the covenant not to compete with any other distributor. Thus, the only way that Bodemer could have possibly violated the covenant not to compete is if the term "miles" in the agreement refers to nautical, and not statute miles.

Under Indiana law, when dealing with an undefined term in a contract, the rule is that the plain meaning of the word is to be used. *A.S. v. LaPorte Reg'l Health Sys., Inc.*, 921 N.E.2d 853, 858-59 (Ind. Ct. App. 2010). When interpreting a contract, Indiana courts strive to "ascertain and give effect to the parties' intent." *City of Kokomo ex rel.*

---

[27] A nautical mile, "[a] unit of length used in sea and air navigation," is equal to 6,076 feet. WEBSTER'S II: NEW COLLEGE DICTIONARY 729 (1999). A statute mile, the unit of measure used for driving, is equal to 5,280 feet. *Id.* at 694.

*Goodnight v. Pogue,* 940 N.E.2d 833, 841 (Ind. Ct. App. 2010). Swanel would have the court believe that the parties actually intended to use nautical miles in the covenant not to compete, despite the fact that term is typically used in sea and air navigation, and despite the fact that Swanel has presented no evidence that the parties intended for the word miles to refer to nautical miles. The court concludes that the plain meaning of the word "miles" refers to a unit of measure equal to 5,280 feet, a statute mile.

Because Swanel does not contest the fact that Kam's is not within 100 statute miles of Swanel's headquarters, and because Swanel has not argued that Bodemer violated the covenant not to compete in any other way, Bodemer has shown "that the evidence . . . is 'so one-sided that . . . [the movant] must prevail as a matter of law'" and may obtain summary judgment in his favor. *Reserve Supply Corp.,* 971 F.2d at 42 (7th Cir. 1992) (quoting *Liberty Lobby, Inc.,* 477 U.S. at 251-52). Thus, Bodemer's motion for summary judgement as to his claim seeking a declaratory judgment that he has complied with the covenant not to compete is **GRANTED**. When the court issues judgment in this case, it will include a declaration that Bodemer did not violate the covenant not to compete.

### C. Confidentiality Agreement

Bodemer also seeks a declaration that the confidentiality agreement is unenforceable. (DE # 35 at 4.) As explained in more detail above, the confidentiality agreement in this case is too broad and is thus unenforceable under Indiana law. There are no genuine issues of material fact as to the enforceability of the confidentiality

agreement, and Bodemer has shown "that the evidence . . . is 'so one-sided that . . . [the movant] must prevail as a matter of law'" and may obtain summary judgment in his favor. *Reserve Supply Corp.,* 971 F.2d at 42 (7th Cir. 1992) (quoting *Liberty Lobby, Inc.,* 477 U.S. at 251-52). Thus, Bodemer's motion for summary judgement as to his claim seeking a declaratory judgment confidentiality agreement is unenforceable is **GRANTED** as to its enforceability under Indiana law, and, as noted above, **DENIED** as to its enforceability under the law of any other state.

### D. Trade Secrets

Bodemer also seeks a declaration that Swanel lacks any protectable trade secrets. (DE # 35 at 26.) As explained in more detail above, genuine issues of material fact remain as to whether Swanel possesses trade secrets. Thus, Bodemer has not shown "that the evidence . . . is 'so one-sided that . . . [the movant] must prevail as a matter of law'" and may not obtain summary judgment in his favor. *Reserve Supply Corp.,* 971 F.2d at 42 (7th Cir. 1992) (quoting *Liberty Lobby, Inc.,* 477 U.S. at 251-52). Therefore, his motion for summary judgment as to his claim seeking a declaration that Swanel does not possess trade secrets is **DENIED**.

### OTHER PENDING MOTIONS

Swanel has also moved to file its statement of genuine issues and the accompanying documents under seal. (DE # 46.) The Seventh Circuit has stated that "[i]nformation that affects the disposition of litigation belongs in the public record unless a statute or privilege justifies nondisclosure." *United States v. Foster,* 564 F.3d 852,

853 (7th Cir. 2009). The Seventh Circuit has recognized, however, that documents that contain information that meets the definition of trade secret or other confidential information may be sealed. *Id.* As previously discussed in more detail, Swanel may have information that constitutes trade secrets. Therefore, Swanel's motion to seal (DE # 46) is **GRANTED**.

Bodemer has also moved to strike Swanel's statement of genuine issues and portions of the affidavits supporting its statement of genuine issues. (DE # 45.) Although the court may have relied on portions of these documents at points in its analysis, it did not do so on any matter that was resolved against Bodemer. Therefore, Bodemer's motion to strike (DE # 45) is **DENIED AS MOOT**.

## III. CONCLUSION

For the foregoing reasons:

1. Innovative Beverage and William Bodemer's motion for summary judgment on Swanel Beverage's Indiana Uniform Trade Secrets Act counterclaim is **GRANTED IN PART** and **DENIED IN PART**. (DE # 34.)

2. Innovative Beverage and William Bodemer's motion for summary judgment on Swanel Beverage's breach of contract claim is **GRANTED IN PART** and **DENIED IN PART**. (DE # 34.)

3. Innovative Beverage and William Bodemer's motion for summary judgment on their own action seeking a declaration that Bodemer did not violate the covenant not to compete that he entered into with Swanel Beverage is **GRANTED**. (DE # 34.)

4. Innovative Beverage and William Bodemer's motion for summary judgment on their own action seeking a declaration that the confidentiality provision that Bodemer entered into with Swanel Beverage is **GRANTED IN PART** and **DENIED IN PART**. (DE # 34.)

5. Innovative Beverage and William Bodemer's motion for summary judgment on their own action seeking a declaration that Swanel Beverage does not possess trade secret information is **DENIED**. (DE # 34.)

6. Swanel Beverage's motion to file documents under seal is **GRANTED**. (DE # 46.)

7. Innovative Beverage and William Bodemer's motion to strike is **DENIED AS MOOT**. (DE # 45.)

**SO ORDERED.**

Date: July 31, 2012

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT